EASTERN AIR LINES, INC. *v.* PHOENIX SAVINGS
AND LOAN ASSOCIATION, INC.

[No. 153, September Term, 1964.]

196

*Decided June 4, 1965.*

The cause originally was argued before PRESCOTT, C. J., and HAMMOND, HORNEY and SYBERT, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned, and reargued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY, SYBERT and BARNES, JJ., and CARTER, J., specially assigned.

*Joseph Pickus* (on both arguments), with whom were *Hyman P. Tatelbaum, Schimmel, Hettleman & Tatelbaum* and *Sullivan & Pittler* on the brief, for the appellant.

*Clarence W. Sharp* (on both arguments), with whom was *Herbert H. Rosenbaum* on the brief, for the appellee.

HAMMOND, J., delivered the majority opinion of the Court. PRESCOTT, C. J., and SYBERT and CARTER, JJ., dissent. Dissenting Opinion by CARTER, J., at page 208, *infra.*

The question presently to be decided is whether Judge Oppenheimer who was supervising the reorganization of Phoenix Savings and Loan Association, Inc., the appellee, in the Circuit Court of Baltimore City properly rejected the claim against Phoenix which Eastern Air Lines, Inc., the appellant, had filed in the proceedings.

The Conservator and a Protective Committee of Phoenix stockholders offered a plan of reorganization which after notice and hearing was approved. The essence of the plan was the pouring into Phoenix of new equity capital of $500,000 by the private corporate insurer of the deposits and a group of underwriting entrepreneurs. Creditors and free shareholders were given twenty days from the "Date of the Plan" (the date the plan was approved by the court for filing in the proceedings) to file claims, and all creditors unpaid on the "Date of Reorganization" (the date the Conservatorship terminated and "Phoenix shall be reorganized and recapitalized") were to be paid in full, without interest, in equal monthly installments, over a period of two years from the "Date of Reorganization." The court was given power to appoint a special master to implement the working out of the Plan.

After the Plan was approved, Eastern, in proper person, timely filed its claim on June 21, 1962, in customary and acceptable form. On October 29, 1962, Judge Oppenheimer discharged the Conservator as contemplated by the Plan. The order of discharge read in part as follows:

"19. That the claims of the creditors of Phoenix totalling $66,319.63 listed below as approved by the Conservator be and they are hereby ratified and shall be paid in accordance with paragraph 13 of the Plan, provided that the provisions of this paragraph shall

be without prejudice to the proper officers of Phoenix to refuse to honor such claims if good and sufficient cause can be shown. * * *

[The claim of Eastern in the amount of $5,306.25 was listed with some twenty-nine others at the end of paragraph 19 of the discharge order under the heading "Claims of Creditors Which Have Been Approved For Payment By The Conservator."]

"21. That any claims against Phoenix other than those listed in paragraph 19 of this Order shall be referred to J. Martin McDonough, Esq., who is hereby appointed as Special Master to take testimony and make a final determination subject to further orders of this Court on the question of whether such claims should be recognized as legal liabilities of Phoenix."

On November 20, 1962, the court passed an order establishing the mechanics for determining what claims of creditors and free shareholders the reorganized association, which was to arise from the ashes of the old Phoenix, must pay.

It provided that proper officers of the new Phoenix should within thirty days file with the court a list of creditors whose claims had been approved by the Conservator but rejected by the new Phoenix, "pursuant to Paragraph 19 of the Order" (the order of October 29, discharging the Conservator), and for notice by letter and by publication to interested creditors. The order then provided that any creditor who did not acquiesce in the rejection of his claim should, by petition filed with the court within sixty days, indicate an intention to contest in whole or in part the denial of such claim and to place the matter at issue before the Special Master. The order further provided that any creditor who failed to petition the court within the specified sixty days "* * * shall be deemed to have acquiesced in the denial of such claim * * * and this Court shall pass an appropriate order barring such claim * * * and declaring any and all rights thereunder null and void." In any proceeding before the Special Master, the creditor was to be designated as the "plaintiff" and the new Phoenix as the "defendant."

Despite the fact that the order of court of October 29, which ratified the approval by the Conservator of Eastern's claim, specified that Phoenix could refuse to honor the claim "if good and sufficient cause can be shown" and the order of November 20 directed Phoenix to file with the court a list of the creditors "* * * whose claims have been approved by the Conservator but whose claims the proper officers of Phoenix have refused to honor *pursuant to Paragraph 19 of the Order* [of October 29]" (emphasis supplied), Phoenix has never shown any cause for its rejection of Eastern's claim, contenting itself with advising the court that it had "refused to honor" the claim of Eastern, and those of others listed. (We were told at the argument that the question Phoenix had was were those aeroplane trips necessary, at least for Phoenix's corporate purposes or best business interests.) Nevertheless, Eastern concedes that all concerned in the Conservatorship proceedings understood from the orders of October 29 and November 20 that it was intended that any claim listed under Paragraph 19 of the order of October 29 could be referred to the Special Master for his determination on the merits, and, so, no point is made as such of the failure of Phoenix to show any reason for rejection of Eastern's claim, save an apparent desire not to pay it.

Notice was given Eastern by certified mail posted on December 31, 1962, that its claim had been rejected by Phoenix and on January 16, 1963, well within the specified sixty-day period, Eastern sent a letter to the clerk of the Circuit Court of Baltimore City, offering for filing a petition which began "Comes now Eastern Air Lines, Inc. (Eastern) and shows the Court as follows:" and then recited the facts and amount of Eastern's claim, acknowledged the receipt of Phoenix's challenge to the validity of the claim, and said: "Eastern maintains that its entire claim is valid, due and owing from Phoenix and that the management of Phoenix has no good faith grounds for contesting the validity of such claim." Eastern then petitioned the court "to place this matter at issue before the Special Master." The petition was signed by Eastern's controller.

Judge Oppenheimer wrote Eastern on January 21, 1963, returning the petition, citing Rule 30 of the Supreme Bench of

Baltimore City, that no "pleading or other paper offered for filing in behalf of a corporation by anyone other than an attorney duly licensed to practice law in the State of Maryland, * * *" could be accepted by any clerk of any court comprising the Supreme Bench, and advising Eastern that its petition could be considered only if filed by a Maryland lawyer.

On June 26, 1963, Eastern presented to the court a petition signed on its behalf by Maryland lawyers, setting forth the background of its claim and its effort to have it presented for determination and praying that the matter be set down for hearing before the Special Master. A show cause order was attached to Eastern's petition and the petition and the attached order constituted Paper Number 307 in the proceedings. Judge Oppenheimer wrote "refused June 26, 1963" on the paper and signed his name.

Also filed on June 26 was an interim report of the Special Master in which he advised the court that three creditors, including Eastern, had not filed the required petitions of contest to Phoenix's rejection of their claim and recommended the signing of an order he had prepared, disallowing these claims. The report and order constituted Paper Number 308 in the proceedings. Judge Oppenheimer, on June 26, 1963, signed the order disallowing the claims.

On March 17, 1964, the Special Master filed a supplemental report in which he recited the sending to the clerk by Eastern of its petition in proper person on January 16, 1963, asking that its claim be passed on by the Special Master, and the subsequent rejection of that petition and of the disallowance of the claim, and the fact that, despite the signing of the order of June 26, 1963, the Master, "erroneously believing that the claim of Eastern Air Lines, Inc., had been referred to him," had set and, on March 11, 1964, conducted a hearing at which counsel were heard but no testimony taken. The Master informed the court that he had concluded he had no jurisdiction in the matter because of the action of the court on June 26 in refusing to allow Eastern to have its claim heard, and said: "The Special Master further finds that no petition was timely filed by Eastern Air Lines, Inc., and that, in any event, said claim has been disallowed by the order of June 26, 1963 * * *." On the same

day, March 17, 1964, the chancellor approved the supplemental report by signing an order which in part read:

> "Ordered that the Report of the Special Master on the claim of Eastern Air Lines, Inc., be and it is hereby adopted, ratified and approved, and that the two Orders dated June 26, 1963 (Papers 308 and 307) remain in full force and effect."

The appeal is from the orders of June 26, 1963, and the order of March 17, 1964, approving the orders of June 26.

In furtherance of the aim and purpose of law to ascertain and give effect to the truth and so do substantial justice, there has evolved a rule, exemplified in various aspects, that the filing within the period of limitations of an assertion of a claim which is deficient or wrong in form or otherwise technically defective will toll the statute of limitations to the extent that the filing of a correct assertion of claim after the expiration of the statute will relate back to and validate the original assertion of claim, as long as the corrected statement does not introduce a new cause of action or a new theory of liability or new parties. 34 Am. Jur. *Limitation of Actions,* Secs. 260-264, 266; *Cline v. Fountain, Etc., Company,* 214 Md. 251; *Brooks v. Childress,* 198 Md. 1; *Doughty v. Prettyman,* 219 Md. 83; *cf. Haldas v. Comrs. of Charlestown,* 207 Md. 255; and *Talbott v. Gegenheimer,* 237 Md. 62.

An application of this rule, analogous in the present circumstances, is found in the bankruptcy decisions. The courts have alleviated the strictness of the bar in bankruptcy, that claims must be filed within the statutory period of six months if the creditor is to share in the estate, by liberally allowing amendments filed after the expiration of the prescribed period of limitations to validate a defective claim offered within the period. 2 *Remington on Bankruptcy* (Henderson Ed., 1956), Secs. 723, 746-752. In Sec. 752, p. 178, the author says: "* * * it has long been the practice to permit amendments curing mistakes of either fact or law, in the absence of fraud, provided injustice to others will not result." In Sec. 888, it is said (p. 347):

> "The fact that the application to amend does not come until after expiration of the filing time is of no

particular consequence, except as it precludes the introduction of a new or materially different claim. Thus a defective verification can be cured, other technical defects supplied, or the claim be particularized or amplified, and minor oversights or errors in stating it can be corrected."

The case of *In re Pacific Lumber and Fuel Co.* (7th Cir.), 194 F. 2d 995, permitted, several months after the end of the bar period, the amending of a defective claim which had been filed within the prescribed time in order to allow verification by an officer of the corporate claimant instead of by an attorney and to improve the statement of consideration, particularly stressing that the only objection to the original claim was to its form. For a similar holding, see *In re Supreme Appliance and Heating Co.* (W. D. Ky.), 100 F. Supp. 200.

*Remington* says further in Sec. 888 (p. 349) : "Even an order expunging a claim does not necessarily remove it beyond the field of amendment or being perfected after time." Cited in support is *In re Casey,* (S. D. N. Y.) 53 F. Supp. 879. Similarly, *Remington* continues in that section, "* * * the return of a proof of claim by the referee with a request for further details does not prevent it from being considered as having been filed in time, for purposes of amendment." Cited in support of this statement is *Cook v. Union Trust Co.* (4th Cir.), 71 F. 2d 645, in which the referee returned a claim with instructions, the compliance with which would, he said, entitle it to refiling. The court permitted the refiling nunc pro tunc after the bar period had expired. See also *Hutchinson v. Otis, Wilcox & Co.,* 190 U. S. 552, 47 L. Ed. 1179; *In re W. H. Calder Company* (E. D. N. C.), 146 F. Supp. 389; affirmed sub nom., *Fyne v. Atlas Supply Company* (4th Cir.), 245 F. 2d 107.

In *Glenn on Liquidation* (1935), Sec. 456, p. 640, it is said, speaking of amendments having retroactive effect of defective claims in bankruptcy proceedings after the bar period :

"So long as (a) an entirely new claim is not introduced, (b) the amended claim is not flatly inconsistent with the one originally made, and (c) it appears that within the prescribed time limit the credi-

tor had placed something on the record which showed the nature of his claim, he will be allowed to amend."

In Sec. 457, at p. 643, the author, speaking of the practice in state courts, as well as federal, says:

"A practice quite different from that of bankruptcy prevails wherever an estate is administered in equity. Then, although a time limit is always fixed for the presentation of claims, there is no inhibition, much less prohibition, as to allowing a belated creditor to come in. So long as no one is hurt by it, and the interests of the other creditors are not prejudiced, permission is given almost as a matter of course; at least that is the general interpretation of the decisions."

The texts and cases support these statements. In 45 Am. Jur. *Receivers* Sec. 247, p. 192, it is said:

"Where one is guilty of serious inadvertence in not filing his claim in receivership within the time limited by an interlocutory order, but it is clear that he has not been guilty of laches, it does not appear that his inadvertence in any way misled the court, the receiver, or others, and it appears that he has prosecuted his claim with vigor before and after the receivership, he should not be barred of relief."

See also 75 C. J. S. *Receivers* Sec. 271 (b), p. 908. The editor of the annotation "Claims against Insolvent—Time Limitation," 109 A. L. R. 1404, summarizes the conclusion he has derived from researching the cases in part thus (p. 1405):

"In such cases [where rejection would be inequitable because, for example, the allowance would not prejudice others as a surplus would remain after full payment of other claims which would go to the insolvent] equitable considerations outweigh the policy of quick and speedy administration of insolvent estates, and, as stated, the courts have under these circumstances frequently allowed the filing of a claim long after the expiration of the time fixed, without regard to whether the delay was excusable."

Judge Hand, in reversing for the Court a district judge who had dismissed a petition which had sought to file a claim against an insolvent corporation in receivership after the expiration of the time limit set by the district judge, said in *Employers' Liability Assur. Corp. v. Astoria Mahogany Co.* (2d Cir.), 6 F. 2d 945, 946:

> "Orders of foreclosure are primarily intended for no more than safety in distribution. In this regard they are like the early orders of the same kind of the English Court of Chancery in the administration of a decedent's estate. * * * They enable the receivers to dispose of the property, but not to forfeit the rights even of dilatory creditors. That delay may be enough we do not deny, but certainly not unless the result of allowing the claim is to destroy intermediate interests, arising on the faith of creditors' inaction."

The principles discussed have been applied by the Supreme Court in cases, like the one at bar, where the insolvent corporation has emerged from the receivership as a continuing entity and the claim is or has become in essence directly adversary— creditor vis-a-vis the corporate debtor. In *St. Louis & S. F. R. R. v. Spiller,* 274 U. S. 304, 71 L. Ed. 1060, Spiller did not file a claim with the receiver of the railroad, although a court order so required within a specified time. Rather, he filed a suit against the railroad and, after the railroad was reorganized filed a petition to intervene in the receivership and assert the judgment he had obtained. The Supreme Court held he was entitled to do so. Justice Brandeis, for the majority, said (pp. 314-315):

> "He [Spiller] was guilty of a serious inadvertence in not filing his claim in the receivership suit within the time limited by the interlocutory order. But it is clear that he has not been guilty of laches. * * * And it does not appear that his inadvertence misled in any way the court, the receivers, the Reorganization Committee, or the new company. * * * With knowledge of Spiller's claims, the Reorganization Committee and

the new company took over the property. * * * Under such circumstances, neither the long delay, nor the failure to file claims as required by the interlocutory and final decrees, should operate to prevent the appropriate relief * * *."

See also *Texas and Pacific Railway Company v. Manton*, 164 U. S. 636, 41 L. Ed. 580.

The facts in the case before us make it one in which it is particularly appropriate under the principles we have discussed to have permitted the late perfection of a timely filed claim. Eastern did timely file its claim in proper form and, as is generally permitted in bankruptcy and receivership proceedings (as Phoenix concedes), in proper person. Filing of a claim by a corporation in proper person, it would seem, is permitted by Md. Rule BP4 b 2(d)(3), governing proceedings involving receivers and assignees or trustees for creditors, which reads: "Where the claimant is a corporation, association or partnership, the claim may be verified by any officer or partner thereof, or any agent thereof authorized to make and file such claim." The claim as filed was one of those approved for payment by the Conservator and the court to enable the Protective Committee and the new underwriting group to know what valid debts of the old Phoenix the new Phoenix would have to pay over a two-year period. There is much force to Eastern's argument that the notice of contest required to be filed after Phoenix had —without showing reason or cause—rejected Eastern's claim was not a "pleading or other paper" within the meaning of Rule 30 of the Rules of the Supreme Bench of Baltimore City, any more than the original claim, since the notice of contest did no more than reassert the intention of Eastern, originally asserted when it filed the claim, to collect what was due it by Phoenix. However, Rule 30 has been held constitutional and valid, *Ashley-Cooper Sales Services v. Brentwood Mfg. Co.*, 168 F. Supp. 742 (D. C. Md., Watkins, J.), and if it be assumed that the notice of contest was within the requirements of the Rule, the fact remains that the court, the Special Master and the officials and underwriters of the new Phoenix were specifically informed by the notice of contest that Eastern intended to in-

sist on its rights as it saw them. The notice of contest needed only the signature of a Maryland lawyer to make it, beyond question, effective to require a hearing before the Special Master to decide the merits of the claim.

The weight of authority seems to be that the absence of a signature to a pleading does not make it void or a nullity but only irregular. The case of *Canadian Bank of Commerce v. Leale* (Ct. of App. Calif.), 111 Pac. 759, citing many supporting cases, so found. There, a complaint seeking recovery on a promissory note was filed one day before the end of the period of limitations. Neither the plaintiff nor its counsel had signed the complaint. An amended complaint bearing both signatures was filed fifteen days later. The Court held that the filing of the unsigned complaint commenced the action and tolled the statute, and the omission of the signatures was an irregularity which could be cured by an amendment which related back to the original filing. See also *J. M. Batterson Estate, Inc. v. Edwards* (Mo.), 115 S. W. 2d 1, to the same effect.

After Judge Oppenheimer wrote Eastern on January 21, 1963, telling it that Maryland counsel must file the petition of contest if it were to be considered, Eastern unquestionably was dilatory in waiting until June 26, some five months later, to offer a petition of contest properly signed by Maryland lawyers; but it was not guilty of laches for no one was hurt or prejudiced. Undoubtedly, it should not have taken a chance that the sixty-day requirement did not continue to be operative but Judge Oppenheimer's letter did not say when a properly signed petition must be presented and Eastern may not have inexcusably assumed that the original sixty-day requirement no longer applied to its claim now that it had in fact put the court and Phoenix on notice it would press its claim. In any event, the petition, signed by Maryland lawyers, which sought to validate the notice of contest and, to this extent, further validate the properly filed claim, was offered to and refused by the chancellor before the final order barring claims, including Eastern's, was signed, as the numbers of the papers show. No good purpose was served by the barring of the claim. If the chancellor had, as we think he should have, permitted Eastern's claim to be determined on the merits, not even significant inconve-

nience to, or delay in, the administration of the Conservatorship proceedings, much less any real harm or prejudice to any other creditor or shareholder or to Phoenix or its new owners would have resulted. The new Phoenix, in order to be released from court supervision so as to begin a new corporate life as an active building association, had, with full notice that Eastern's claim had been tentatively approved as owed and payable, agreed to pay the claim unless it could show good cause why it was not due. Phoenix did not show any cause and, in good conscience, cannot complain that Eastern may not correct the technical defects in the perfection of its duly filed claim and thereby achieve the opportunity to show before the Master, with the burdens of a plaintiff, that the old Phoenix was indebted to it.

The views we take of the case are in harmony with Maryland law on the subject. Md. Rule BP4 c provides in paragraph 1 that before the date of reference to the auditor a claim filed after the specified bar date "shall be entitled to distribution as though filed by the specified date." Paragraph 2 provides that only for good cause shown can any allowed claim, filed after reference to the auditor, participate "in the *immediately following* distribution" (emphasis supplied), and if he does he may have to pay all or part of the cost of restating the account. Paragraph 3 provides that one who has filed too late to be included in an auditor's account "* * * shall be entitled in any subsequent account to receive a dividend on the same basis as those already received by other creditors in prior accounts, before such other creditors are allowed any further dividends, and thereafter to share with them in any future dividends."

It is apparent that under these rules a creditor who files late has an absolute right which does not, except to the extent that prejudice to others results from the late filing, depend on good cause shown to participate in funds in the hands of the court available for distribution. The rationale of the rules as to late filing would certainly extend to and include late perfection of an already validly filed claim, and in the case before us, there had not been any distributions or payments to other creditors. The funds available for distribution under the supervision of the court were those of the new Phoenix, and at that time none had been distributed.

The present rules reflect the earlier case law that, absent laches amounting to prejudice to others, late filing is permitted as a matter of course as to undistributed funds in the hands of the court. See Miller, *Equity Procedure* (1897), Sec. 540; *Strike's Case*, 1 Bland 57, 86; *Hammond v. Hammond*, 2 Bland 306, 364-365; *Dixon v. Dixon*, 1 Md. Ch. 220; *Penrose v. Page*, 145 Md. 1, 11; *cf. Price v. Merchants Bank*, 29 Md. 369, 375-376; *Trayhern v. Nat. Mech. Bank*, 57 Md. 590, 597-598.

The orders appealed from, that of March 17, 1964, and those of June 26, 1963, which are referred to and approved in the later order, must be reversed and the case remanded for determination on the merits of Eastern's claim against the new Phoenix.

> *Orders reversed, with costs, and case remanded for further proceedings consistent with the opinion herein.*

CARTER, J., filed the following dissenting opinion, in which PRESCOTT, C. J., and SYBERT, J., concurred.

The majority opinion reversing the orders of the Circuit Court of Baltimore City which disallowed the appellant's claim is based on a well settled rule allowing amendments of defective claims which have been seasonably filed in insolvency proceedings after the time set for filing has expired, as well as the filing of an original claim after the time limited therefor, when no prejudice will result to others. I have no disagreement that such is the rule to be followed by an equity court in this state when dealing with that question in an insolvency proceeding. The point on which I do disagree is that such a question is presented here.

The conclusion of the majority that the attempted filing of the petition with the clerk on January 16, 1963, was, in effect, the attempted filing or refiling of a claim in an insolvency proceeding, and the later offer to file a duly executed petition on June 26, 1963, was, in effect, an offer to amend a claim previously filed, and dealing with the questions here presented on this basis, appears to be an erroneous interpretation of the na-

ture of the petition. On the contrary, it appears from provisions of the court's orders that the petition was, in effect, the initial pleading, or paper, in a judicial proceeding, adversary in nature, which the court had established for the purpose of having the parties fully heard and the merits of the appellant's claim finally determined. "Judicial proceeding" has been defined as "a proceeding wherein there are parties, who have opportunity to be heard, and wherein the tribunal proceeds either to a determination of facts upon evidence or of law upon proved or conceded facts." *Black's Law Dictionary* (4th ed.) p. 986. The same authority defines "adversary proceeding" at p. 73 as "one having opposing parties; contested, as distinguished from an *ex parte* application, * * *."

Under the authority of Code (Cum. Supp. 1964), Art. 23, § 161K, the court on July 17, 1961, appointed a conservator of the appellee savings and loan association, hereafter called "Phoenix." Thereafter, the appellant filed its claim against the association in the amount of $5306.25. On October 29, 1962, the court passed an order confirming the approved plan of reorganization, discharging the conservator, turning the affairs of the old Phoenix over to an interim board of the new Phoenix and in paragraph 19, conditionally ratifying certain claims against Phoenix which had previously been approved by the conservator, including the appellant's claim, but providing further "that the provisions of this paragraph [19] shall be without prejudice to the proper officers of Phoenix to refuse to honor such claims if good and sufficient cause can be shown."

By order dated November 20, 1962, the court provided the procedure for referral of the denied claims to a special master, which required that a list of all claims rejected by the officers of Phoenix be filed with the court within thirty days; that notice by certified letter be sent to all listed creditors advising them that the conservator had been discharged; that the old Phoenix had been reorganized; that in accordance with the plan of reorganization the claim of the recipient of the notice had been denied by the proper officers of the new Phoenix and that the court had "ordered the matter referred to a Special Master for the taking of testimony and *a final determination on the question of whether such claim * * * shall be recognized as a legal obliga-*

*tion of Phoenix."* (Emphasis supplied.) A copy of the order, included with the notice, further required that any creditor who did not acquiesce in the denial of its claim "shall, within 60 days of the mailing of the certified letter, * * * petition this Court, contesting in whole or in part and placing at issue before the Special Master the denial of such claim * * *." And that if a creditor so notified "shall fail to petition this Court within the period specified * * * said creditor * * * shall be deemed to have acquiesced in the denial of such claim * * *"; that the special master give appropriate notice of the time and place of hearing, to be held not less than thirty days after the filing of the petition; and that in such proceeding "the creditor * * * shall be 'plaintiff' and Phoenix shall be 'defendant.'" The time limitation set by the order for filing of the petition by the appellant expired on March 1, 1963. On January 16, 1963, the appellant presented its petition to the clerk asserting that its entire claim was valid and requesting the matter be placed at issue before the special master. The petition was not filed but returned to the appellant with a letter from Judge Oppenheimer pointing out that under the provisions of Rule 30 of the Supreme Bench of Baltimore City, since the claimant was a corporation, it would be necessary to file the petition through legal counsel. Nothing further was heard from the appellant until June 26, 1963, on which day it offered to refile its petition through counsel, which the court refused, on the basis it had not been seasonably filed in compliance with the order of court. On the same day the court passed an order disallowing the appellant's claim.

The court procedure prescribed for final determination does not appear to establish a method of merely reasserting or refiling the claim which the appellant originally filed on June 21, 1962, but rather, gives the appellant notice that if it does not enter into a judicial proceeding, adversary in nature, before the special master, to finally determine the merits of its claim, according to the prescribed procedure, and thereby establish the claim, such claim will be disallowed. The notice further pointed out that in order to present the matter before the master it would be necessary that the appellant *file a petition with the court within sixty days* setting forth what part of the denied

claim is being contested by it and asking the master to put the matter at issue. Such a proceeding clearly seems judicial in nature and therefore comes within the letter and spirit of Rule 30 of the Supreme Bench of Baltimore City. This rule prohibits any clerk from accepting "any pleading or other paper offered for filing in behalf of a corporation by anyone other than an attorney * * * in any suit or action at law or in equity * * * or to which such corporation is a party." The rule was found not to be unconstitutional in *Ashley-Cooper Sales Services v. Brentwood Mfg. Co.,* 168 F. Supp. 742 (D. Md. 1958), in an opinion by Judge Watkins who ruled it was a reasonable procedural regulation. In discussing the purposes of the rule, it is stated (at p. 745) that "it arises out of the necessity, in the proper administration of justice, of having legal proceedings carried on according to the rules of law and the practice of courts and by those charged with the responsibility of legal knowledge and professional duty." The hearing to be conducted here appears to be a *legal proceeding* to be carried on and determined according to the rules of law and practice of courts wherein the legal knowledge and professional duty of a duly licensed member of the bar is as necessary and valuable to the orderly and effective presentation of the cause as would ever be the situation in any suit formally conducted before the circuit court. It seems, therefore, that this proceeding should be considered both a *suit in equity* within the meaning of that phrase as used in the rule and a *legal proceeding* in the sense in which such phrase is used in the opinion interpreting the purposes of the rule in the *Brentwood* case. Therefore, the provisions of the rule were properly applicable to the petition which the appellant attempted to file on January 16, 1963, and it was thereby made ineligible for filing in the form in which it was presented.

It is conceded that the Supreme Bench had the authority to adopt the rule involved in this case under the provisions of Maryland Rule 1 f. We have stated that rules which this Court has the power to adopt have the force of law and there is therefore "no reason why they are not controlled by the same principles applicable to legislative enactments." *Goldston v. Karukas,* 180 Md. 232, 235, 23 A. 2d 691 (1942). In dealing with the

statute of limitations this Court has held that the filing of a suit arrests the running of the statute, *Lichtenberg v. Joyce,* 183 Md. 689, 699, 39 A. 2d 789 (1944), *Zier v. Chesapeake Ry. Co.,* 98 Md. 35, 40, 56 Atl. 385 (1903). The appellant urges that, by analogy, the offer to file the petition in this case tolls or arrests the running of limitations. The difficulty with this contention is that the petition was never in fact filed with the court or accepted for that purpose. However, the authorities in other jurisdictions indicate that even if it had been erroneously filed, it would not have operated as an arrest in the running of the time limitation. What constitutes an arrest by reason of the institution of a suit is discussed generally in 34 Am.Jur., *Limitation of Actions,* § 254, where it is said:

> "Proceedings which are void do not suspend the operation of the statute * * *. Nor will the running of the statute of limitations be stopped by the institution of a suit by a foreign corporation which has not complied with the provisions of a local statute which require that it shall not prosecute a suit in the state until it has complied. In such a case, a subsequent compliance with the statute will not validate the action from its inception so as to avoid the limitation period which had expired between the time of commencing the suit and the compliance with the statute."

The provisions of Rule 30 are mandatory and require compliance therewith as a condition precedent to the right of a corporation to institute suit or file papers or pleadings therein. Until there has been compliance any attempt to do so would appear void and of no legal consequence. Therefore, the attempt to file the petition on January 16, 1963, was not the institution of a suit and did not arrest the running of the sixty day limitation period.

In respect to the contention that the court abused its discretion in refusing to suspend or modify its order so as to allow the appellant to file a belated petition after the time limited therefor, this Court has held that rules of court should not be arbitrarily suspended or modified to suit the convenience of litigants in any given case and that a court has no discretion to

dispense with its own rules at its pleasure. See *Quynn v. Carroll*, 22 Md. 288, 295-297 (1864) ; *Hughes v. Jackson*, 12 Md. 450, 463 (1858) ; *Gist v. Drakely*, 2 Gill 330, 346 (1844) ; *Wall v. Wall*, 2 H & G 79 (1827). Although a court has inherent power to suspend or modify its rules where justice requires, in *Carroll v. Barber*, 7 H & J 454 (1826), where the Court was concerned with the surrender of bail on the sixth day after the term had convened when the rule required surrender within five days, it was said at p. 456 :

> "Courts will sometimes enlarge or suspend their rules when the ends of justice require it to be done. But there is nothing of that kind here. It appears to be the common case of a special bail neglecting to avail himself of the time allowed him to surrender his principal ; and there is nothing to find fault with, in the refusal of the court to receive the surrender after the expiration of the time. Rules of court are necessary to the due administration of justice ; but the rule in question would be perfectly useless, if in such a case as this it is not to be enforced."

And in *Wall v. Wall, supra,* the Court in determining that a plea of limitations must be filed within the time fixed by rule of court, said, at p. 81 :

> "But where a court has established rules for its government and that of suitors, fixing days for the filing of pleadings ; and where the long established practice of the courts require special pleas to be drawn up and filed at length, there exists no discretion in the inferior court to dispense at pleasure with their own rules, or to innovate upon such established practice ; * * *."

According to these authorities, it appears that under ordinary circumstances, the court has no authority or discretion to suspend or modify its rules merely to accommodate the convenience of a litigant. By the same reasoning employed in the *Carroll* and *Wall* cases, the court order fixing the time within which creditors were required to file their petitions, in the interest of orderly procedure and the prompt administration of justice,

would be made useless if it is to be suspended so as to give any creditor who neglected to comply with its provisions, permission to file his petition at any time after the time limit, as long as the matter is still before the court, no distribution of funds have been made, and no prejudice would thereby result to others. On the other hand, a ruling which would appear more in line with the prior decisions of this Court would require the person seeking suspension to show good cause, such as circumstances beyond his control which had prevented his compliance and that no prejudice would occur to others, in order to justify the court in considering modification or suspension in the interest of promoting justice. No such situation is here presented as to authorize suspension or modification much less constitute an abuse of judicial discretion for failure to do so.

I would therefore hold that the petition presented on January 16, 1963, did not comply with the requirements of Rule 30; that the attempt to file such a petition on that date did not arrest the running of the sixty day limitation period set by the order, and that Judge Oppenheimer's ruling refusing the appellant permission to file the amended petition after March 1, 1963, and disallowing the claim, was correct.

The majority opinion points out that some question exists concerning the right of the officers of Phoenix to have refused to honor the appellant's claim since there is no evidence to establish that they had "good and sufficient cause" for such action. The court orders fail to disclose any requirement that the officers of Phoenix submit their determinations to the court or any other authority for approval. In the absence of evidence to establish an abuse of discretion by the officers in arriving at a decision to deny the claim for good cause, it appears proper to assume that there was no such abuse. Apparently no serious issue was raised below on this point.

In my opinion, the judgment below should be affirmed. Chief Judge Prescott and Judge Sybert have authorized me to state that they concur in this dissent.